## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| BECKY BEWLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:13-CV-01496-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Consent Case |

### MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated July 29, 2013, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED,** and the case is **REMANDED** for reconsideration.

## I.   BACKGROUND

### A.   Procedural History

Becky Bewley (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.[2]  On October 25, 2010, Plaintiff applied for DIB, alleging disability beginning on August 27, 2010, due to fibromyalgia, multiple sclerosis (MS), and arthritis. (R. at 74-75, 175.)  Her applications were denied initially and upon reconsideration.  (R. at 76-80, 84-87.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing held on January 30, 2012.  (R. at 88-95, 99-133, 50-73).  On

---

[2] The background information is summarized from the record of the administrative proceedings, which is designated as "R."

February 23, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 25-44.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on February 11, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.) Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.     Factual History**

**1.     Age, Education, and Work Experience**

Plaintiff was born on August 26, 1957, and she was 54 years old at the time of the hearing before the ALJ.  (R. at 52, 137.)  She completed two years of junior college, and two and half years of court-reporting school.  (*Id.* at 53.)  She had past relevant work as an executive secretary and an administrative assistant.  (*Id.*)

**2.     Medical, Psychological, and Psychiatric Evidence**

Dr. Michael Seals, a neurologist, noted that Electromyography (EMG)/nerve condition studies conducted on Plaintiff on October 19, 2007, revealed evidence of severe "sensory neuropathy" across the right wrist.  (R. at 252- 255.)

Sometime in 2007, Dr. Leyka Barbosa at North Texas Joint Care, P.A., referred Plaintiff to Dr. Brian Cooley at Digestive Health Associates of Texas, P.A., for an abnormal magnetic resonance imaging (MRI).  (*See* R. at 256.)  On December 13, 2007, Dr. Cooley informed Dr. Barbosa that Plaintiff had severe fibromyalgia and irritable bowel syndrome.  (R. at 256.)   He reported that Plaintiff suffered from intermittent nausea and vomiting that had "reached a crescendo pattern" a few weeks earlier, when she was admitted to the emergency room.  (*Id.*)  She had "asymptomatic hemangiomas" that were not causing her any problems, and Dr. Cooley opined that they had no

relation to her symptoms.  (*Id.*)  He noted that she was back to normal at that time, but he recommended an upper endoscopy if her symptoms returned to rule out "gastritis, peptic ulcer disease, etc."  (*Id.*)

On February 19, 2008, and April 16, 2008, Plaintiff saw Dr. Barbosa for "unbearable" knee pain. (R. at 248-49.)  Physical examination revealed tender points and tender joints.  (*Id.*)  Dr. Barbosa diagnosed "[f]ibromyalgia syndrome, [c]ervical spondylosis, [d]egenerative disc disease of the cervical and lumbar spine, [m]igraine headaches, [h]ypertension, [c]hronic fatigue and insomnia problems, [h]istory of seizures, [h]istory of endometriosis, [h]istory of vertigo." (*Id.*)  He prescribed  Cymbalta and Tramadol for pain, since Plaintiff complained that her prior medications were not working.  (R. at 249.)

On January 1, 2009, Plaintiff presented to Dr. Jose Burbano, her primary care physician, for a refill of Hydrocodone.  (R. at 395.)  She returned on May 15, 2009, complaining of pain in her neck, back, and arms due to a motor vehicle accident.  (R. at 393.)  Dr. Burbano advised her to see a pain specialist.  (R. at 394.)

On May 20, 2009, Plaintiff saw Dr. Seals, who noted that he had seen her in the past for right carpal tunnel syndrome.  (R. at 350-51.)  She complained of stiffness in her neck and upper torso, tenderness and soreness over her "right shoulder girdle region," and numbness and tingling in a couple of her fingers due to the May 2009 motor vehicle accident. (*Id.*)  Upon physical examination, Dr. Seals noted that her neck muscles "paraspinal-wise" and the muscles over her "right shoulder girdle" were tender but were not swollen.  (*Id.*)  His impression was "cervical sprain/strain" due to the motor vehicle accident, a long history of "some underlying degenerative cervical spine disease," and "right ulner neuropathy."  (R. at 351.)  Dr. Seals told her that if her ulnar symptoms did not go

away, she might need "EMG/NCV testing" and ulnar transposition surgery.  He recommended that she continue medication for her cervical spine and get physical therapy, but Plaintiff wanted to wait before doing physical therapy.  (*Id.*)

On September 8, 2009, Plaintiff saw Dr. Yong Pak with Irving Orthopedics & Sports Medicine for neck pain, lower back pain, and pain throughout her body due to fibromyalgia and the May 2009 motor vehicle accident.  (R. at 304.)  Dr. Pak noted that an MRI of her brain showed multiple tiny chronic white matter lesions.  (*Id.*)  He also noted that the EMG/nerve conduction study done demonstrated "median sensory neuropathy across the wrist consistent with carpal tunnel syndrome." (*Id.*)  Upon physical examination, he observed that she was awake, alert, "oriented x4," in no acute distress, and she had multiple areas of tender points consistent with fibromyalgia.  (*Id.*)  Her cervical spine range of motion was intact, she had no muscle atrophy, her gait was normal, her muscle strength was "5/5 in the lower and upper extremity" and her sensation was intact.  (R. at 305.)  Imaging of her neck and lower back demonstrated a "C6/7 anterior spurring near the disc," but her lumbar spine was otherwise "negative with normal alignment." (*Id.*)  Dr. Pak recommended that she do physical therapy two to three times a week for fibromylagia.  (*Id.*)  He gave her Norco and Methocarbamol for the pain.  (*Id.*)

On September 22, 2009, Plaintiff returned to Dr. Pak for a follow-up visit.  (R. at 302.)  She reported that the neck and lower back pain continued, and she had pain radiating down her right lower extremity.  (*Id.*)  Dr. Pak noted that Plaintiff had sought out the possibility of going to a chiropractor and said it would cost $6,000.  (*Id.*)  He again noted that she had multiple tender points in her body consistent with fibromyalgia.  (*Id.*)  He indicated an impression of "history of fibromyalgia," cervical radiculpoathy, and lumbar radiculopathy, and he ordered an MRI of her

4

cervical and lumber spine to "further evaluate her complaints." (R. at 302-03.) He encouraged her to start physical therapy, but Plaintiff stated that she was unable to schedule physical therapy at that time. (*Id*.) He prescribed her Percocet and Robaxin, but he discontinued the Hydrocodone. (R. at 303.) The MRI of her lumbar spine showed very "minimal lumbar spondylosis in the form of small broad-based disc bulges," and the MRI of her cervical spine showed "cervical spondylosis resulting in multilevel borderline to mild thecal sac narrowing and mild to severe bilateral neural foraminal narrowing." (R. at 284-85.)

From September 30, 2009 until October 22, 2009, Plaintiff attended five physical therapy sessions at Carrollton Physical Therapy and Work Hardening Center. (R. at 268-276.) She was shown therapeutic exercises to increase strength, range of motion, flexibility, and endurance with the hope of decreasing pain and swelling, improving joint mobility, improving soft tissue flexibility, and facilitating healing. (*Id*.) On October 19, 2009, she reported that her pain had gone down. (R. at 272.)

On October 2, 2009, Plaintiff visited Dr. Pak and reported that her pain continued mainly in the right lower back radiating down to the right leg, and that she experienced occasional numbness and tingling down her upper extremity. (R. at 300.) Dr. Pak decided to continue conservative treatment, and he recommended that she continue physical therapy and pain medicine. (R. at 301.) He prescribed her Percocet and Robaxin. (*Id*.) If she did not improve, he would consider epidurals in the neck and lumbar spine. (*Id*.)

On October 13, 2009, Plaintiff returned to Dr. Yak complaining of pain in her lower right back and her right leg, which she rated as a "10 out of 10." (R. at 299.) She told him that the Percocet was working, but she was taking it more often. (*Id*.) She did know whether the

Hydrocodone or the Percocet was better.  (*Id.*)  Dr. Pak switched Plaintiff back to Hydrocodone but prescribed a higher dosage.  (*Id.*)

On October 26, 2009, Plaintiff complained of having pain "all over" that she rated as a "10 out of 10."  (R. at 297.)  She expressed concern that her medications were not working because she was in a severe amount of pain.  (*Id.*)  Dr. Pak noted that she was in mild distress and that there was tenderness of the "right hip bursa."  (*Id.*)  He injected her right hip bursa with Kenalog, Marcaine, and Lidocaine.  (*Id.*)  He recommended she stop taking Zoloft, and he prescribed her Savella as well as Methadone on a trial basis.  (R. at 297-98.)

On November 9, 2009, Plaintiff returned for a follow-up examination.  (R. at 295.)  Dr. Pak noted that she continued with chronic pain syndrome and complained of pain throughout her body.  (*Id.*)  She had stopped taking Savella because it did not seem like it was working and had gone back to taking Zoloft.  (*Id.*)  She liked the Methodone, however, and said it was one of the best medications she had ever taken because it had significantly reduced her pain.  (*Id.*)  She cut back to taking it "maybe once a day" because she experienced nausea and was not sure whether it was from the Savella or the Methadone.  (*Id.*)  Dr. Pak prescribed her Robaxin for spasms.  (R. at 295-96.)

On March 4, 2010, Plaintiff returned to Dr. Burbano, complaining of pain from her waist down, and he prescribed Vicodin.  (R. at 391-92.)  On May 4, 2010, she stated that the Vicodin was not helping her anymore, and she complained of neck and joint pain. (R. at 388.)  Dr. Burbano noted tenderness in her neck along the cervical spine and sternocleidomastoid, bilaterally.  (R. at 389.)  His impressions were degenerative disc disease, myalgia, and mild depression.  (*Id.*)

On June 8, 2010, Plaintiff returned to Dr. Pak complaining of pain on the right side of her lower back which she rated as " 9 out of 10."  (R. at 293.)  Dr. Pak noted that she had not seen him

in quite some time because she had "apparently lost her insurance." (*Id.*)   Upon physical examination, Dr. Pak noted that there was tenderness in the lumbar paraspinals and her gait was antalgic. (*Id.*)  He injected her sacroiliac (SI) joint with Kenalog, Marcaine, and Lidocaine. (*Id.*)

On June 15, 2010, June 28, 2010, July 27, 2010, August 24, 2010, and September 23, 2010, she complained of pain in her back. (R. at 287-292.)   Dr. Pak modified her Methodone and eventually discontinued it. (R. at 289-292.)  He prescribed her Hydrocodone to help her function and do "her activities of daily living." (R. at 287.)  On October 18, 2010, Plaintiff reported that the medications did not seem to be working and that her pain was a "10 out of 10." (R. at 286.)  Dr. Pak prescribed her Contin. (*Id.*)

On October 21, 2010, Plaintiff returned to Dr. Seals complaining of aches and pains over her whole body as well as numbness and tingling. (R. at 340.)  She reported that she could not go on, and that she could not work in her present condition. (*Id.*)  Upon physical examination, he noted that her speech and comprehension were normal, her cranial nerves appeared to be normal, her coordination and gait were normal, and her reflexes were symmetrically normal. (*Id.*)  Her motor examination was "4-4+/5 in strength," but "it" appeared to give way to weakness due to pain and discomfort. (*Id.*)  Dr. Seal's impression was fibromylagia, right carpal tunnel syndrome, and "right-sided fatigue and weakness complaints but no lateralizing signs on exam." (*Id.*)  He prescribed her Norco and gave her the name of a pain management doctor. (*Id.*)

On October 26, 2010, Plaintiff presented to Dr. Melvin Hu as a new patient. (R. at 353.)  Her chief complaint was low back and leg pain. (*Id.*)  He noted that she'd had "whole body pain" that started in her neck and then extended all over her body for 20 years with no apparent history of onset. (*Id.*)  She described her pain as "throbbing, stabbing, heavy, exhausting, shooting, tender,

sickening, annoying, sharp, [and] achy" as well as "constant," and ranging from an 8 to 10 out of 10. (*Id*.) Standing, climbing stairs, crouching, sneezing, bending, touching the problematic area, and weather change made her pain worse. (*Id*.) Her Norco and Fentanyl medications provided good relief, but anti-inflammatories, muscle relaxants, physical therapy, a chiropractor, and heat and cold did not help. (*Id*.) Dr. Hu noted a past medical history of fibromyalgia, hypertension, and depression. (*Id*.) Plaintiff reported fever, poor sleep, numbness, tingling, muscle pain and spasms, chronic cramps, back pain, depression, and anxiety among other symptoms. (R. at 353-354.)

Physical examination revealed "tenderness on cervical paraspinal area, a tender trapeius and rhomboid muscles," and "[t]ender thoracic spine bilaterally," deceased neck rotation to the right, and decreased neck extension due to pain. (R. at 354.) There was also tenderness on "lumbosacral paraspinal area bilaterally." (*Id*.) Plaintiff's lumbar extension decreased with pain, and a straight leg test at 70 degrees caused bilateral lower back pain. (*Id*.) Dr. Hu's assessment was "lumbosacral spondylosis, sacroiliitis, myofascial pain, and thoratic spinal pain." (*Id*.) He found that Plaintiff would benefit from judicious use of pain medication to better control her pain as well as a "multidisciplinary pain management program including intervention, pain medication, and therapeutic exercise[] program[s] to better control her pain and improve her function." (*Id*.) He noted, however, that her financial status limited her "medical options." (*Id*.) He prescribed Norco, Topmax, and Voltaern gel. (*Id*.)

On November 5, 2010, Plaintiff called Dr. Ellen Dutta, M.D., whom she had been seeing since May 2006 for sinus problems, and reported that the swelling in her chest was bigger, she was having difficulty breathing, and she was "practically bedridden." (R. at 369; *see* R. at 370-384.) Dr. Dutta referred her to a pulmonologist. (R. at 309.)

On December 8, 2010, Plaintiff presented to Southwest Pain Group (SWPG) as a new patient with complaints of "fibromyalgia pain" from her waist and hips down as well as vertigo and dizziness.  (R. at 435.)  She stated that her pain was so bad that she could not function.  (*Id*.)  Dr. Robert Bulger prescribed her Mobic and Cymbalta.  (*Id*.)

On December 30, 2010, Plaintiff returned to SWPG for a medication refill with complaints of pain "from the hips down" and neck pain which she rated a 6 out of 10.  (R. at 431; *see* R. at 427.) Plaintiff reported that the medication regimen made a big difference in the quality of her life, and she was able to control pain sufficiently in order to dress, eat, and "function to some degree."  (*Id*.) Dr. Bulger noted that her neck tenderness was better, and that she was very emotional in describing her pain.  (R. at 432.)  She was alert, oriented, pleasant, and responsive, however.  (*Id*.)  Her "overall status [was] about the same."  (*Id*.)  He discussed with her the need to minimize the use of narcotic analgesics in order to avoid tolerance and/or dependence on the drugs.  (*Id*.)  He found that medication management was indicated "because the patient's pain would not be adequately controlled without the continued use of pain medications and/or adjuvants."  (*Id*.)

On February 4, 2011, Dr. Kelley Davis, a doctor of Osteopathic medicine with disability determination services, examined Plaintiff and completed an internal medicine evaluation.  (R. at 398.)  Plaintiff related daily chronic pain in most of her joints, but mostly in her legs.  (*Id*.)  She reported experiencing episodes of severe chronic pain that left her incapacitated, and she had to go to the emergency room several times for those episodes.  (*Id*.)  She was able to function at a low level in between her episodes, which occurred about every 3 to 4 months.  (*Id*.)  She reported that a neurologist diagnosed MS, but two other neurologists told her they did not think she had MS.  (R. at 399.)  Plaintiff told Dr. Davis that she had weakness, memory problems, and nerve pain, all of

which were getting progressively worse.  (*Id.*)  She was diagnosed with high blood pressure, and she suffered from depression and anxiety.  (*Id.*)  Her depression worsened as her pain worsened.  (*Id.*)  She reported that she was too sick to perform her job because of her chronic pain and episodes with nausea.  (*Id.*)

A review of systems revealed that Plaintiff was positive for joint pain.  (*Id.*)  Dr. Davis noted that Plaintiff was anxious and tearful and in no acute distress.   (R. at 400.)  Her muscle and grip strength were "5/5" in her left and right upper extremity.  (*Id.*)  Her muscle strength measured "4/5" in bilateral quadriceps, hamstrings, and bilateral calves.  (*Id.*)  She could oppose all fingers with her thumbs, and she had full range of motion in her left and right upper extremity.  (*Id.*)  Plaintiff had "positive pain in all trigger points palpated" and "cervical paraspinal tenderness without spasm but with guarding and pain on motion."  (*Id.*)   She had crepitus in both knees and "paraspinal muscle tenderness in [her] entire lumbar spine without spasm but with guarding."  (*Id.*)  Dr. Davis noted that Plaintiff related pain on all motions in the lower extremities.  (*Id.*)  Plaintiff also could not demonstrate the ability to hop and squat due to what she related as pain in her back and legs.  (*Id.*)  She could use her hands without difficulty, but she had difficulty rising from her chair to the exam table due to her back and leg pain.  (*Id.*)  Dr. Davis noted that her conventional and tandem walking appeared antalgic and slow.  (*Id.*)  Plaintiff did not use any assistive devices to walk, and she had decreased sensation in her right ankle.  (R. at 400-401.)

Dr. Davis reported that Plaintiff was "[o]riented to time, place and self."  (*Id.*)  She could relate her medical history and was cooperative.  (*Id.*)  She was tearful throughout the exam and "appeared anxious with some pressured speech."  (*Id.*)  Dr. Davis's impressions were fibromyalgia, chronic pain, arthritis, hypertension, and depression, and she noted that Plaintiff was currently on

10

medication for these illnesses.  (*Id.*)  She also noted an impression for MS, but left it as a question because there were no neurology opinions sent for review regarding MS.  (*Id.*)

On February 22, 2011, Plaintiff returned to SWPG to discuss a medication adjustment, and she rated her pain as a 6 out of 10.  (R. at 427.)  A review of her systems revealed depression, anger, trouble sleeping, worrying, and anxiety.  (*Id.*)  Eric Buchl, the physician assistant, assessed her as having lower back and fibromyalgia pain.  (R. at 429.)  He noted that her overall status was the same, and he recommended that she continue the current medication regimen, start a trial of Trazodone to help her sleep, do a sleep study when she was able, get SI joint injections, and increase her activity as she could tolerate.  (*Id.*)  Plaintiff called SWPG the next day, stating that the Trazodone did not work. (R. at 426.)  Tim Thigpen, the medical assistant, told her that it was too soon to determine the effectiveness of the medication and to give it at least 10 days.  (R. at 426.)

Plaintiff called again on February 25, 2011, complaining that she needed to be seen because she had an issue "with sleeping."  (R. at 425.)  She presented to SWPG on February 28, 2011, to discuss a change in her sleep medication.  (R. at 422.)  She rated her pain as a 9 out of 10.  (*Id.*)  Although Mr. Buchl recommended physical therapy, SI joint injections, and a consult with a sleep expert, Plaintiff stated that she was unable to do those things due to "cost."  (R. at 424.)

On March 14, 2011, Dr. Frederick Cremona, M.D., a medical consultant, completed a Physical Residual Functional Capacity (RFC) assessment for Plaintiff.  (R. at 403-410.)  He noted a primary diagnosis of fibromyalgia and hypertension, and a secondary diagnosis of chronic pain. (R. at 403.)  He opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and pull an unlimited amount of

weight with hand and foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; and never kneel or crawl; with no manipulative, visual, communicative, or environmental limitations. (R. at 403-408.) He noted from his review of the record that she had multiple areas of tenderness consistent with fibromyalgia, she had an antalgic gait, she discontinued Methadone and began Hydrocodone for "breakthru pain," and she had tenderness in the lumbar paraspinals. (R. at 410.) He referenced the majority of Dr. Davis's notes regarding her physical exam of Plaintiff. (*Id*.) He found that the alleged limitations caused by her symptoms were partially supported by the medical record and other evidence in the file, but "the severity of limitations [was] not wholly supported." (*Id*.)

On March 29, 2011, Plaintiff called SWPG requesting that Mr. Thigpen prescribe her regular Ambien. (R. at 467.) He told her that he could give her a refill of her Ambien CR, but he could not change her medication unless she was seen by a provider. (*Id*.)

On April 4, 2011, Plaintiff described her pain as a 10 out of 10 and complained that her current medications were not working. (R. at 463.) Mr. Buchl noted that she had pain in her neck on palpation, and there was tenderness to palpation on her "thoracic/chest/CVS/lungs." (R. at 464.) He added "Zanaflex tid" to her medication regimen and gave her a trial of Nucynta. (R. at 465.) He noted that she was asking for higher and higher medications, and he recommended that she see Dr. Rodrigue to get his opinion prior to increasing her medications. (*Id*.)

On April 15, 2011, Plaintiff called SWPG complaining of chest pain and nausea from the Zanaflex. (R. at 416.) Mr. Buchl recommended that she go to the emergency room, but she declined. (*Id*.) She stated that all medications except narcotics were giving her side effects. (*Id*.)

Plaintiff returned to SWPG on April 22, 2011, for a medication adjustment. (R. at 459.) She

told Rachel Self, the nurse practitioner, that she was starting a new job the next week and "need[ed] to be able to function." (*Id*.) She believed that the medication prescribed last time caused a possible seizure. (*Id*.) Ms. Self noted mechanical and neuropathic pain and gave her a trial of Dilaudid. (*Id*.)

On May 16, 2011, Plaintiff returned for another medication refill. (R. at 455.) Ms. Self noted that Plaintiff came in two weeks early for a refill of Norco because she "had it stolen at pet smart." (R. at 457.) She explained to Plaintiff that she would not refill her medications early. (*Id*.) Plaintiff called SWPG the next day, stating that she had seizures and asking what to do if she went into withdrawal. (R. at 454.) She was told she needed to take the Dilaudid, and if she experienced seizure activity, she needed to go to the emergency room. (*Id*.)

On May 31, 2011, Plaintiff presented to The Hargrave Eye Center for an eye exam. (R. at 438.) Dr. Hargrave noted that Plaintiff had history of an usually large blind spot. (*Id*.) She noted that Plaintiff was positive for MS and that she was not positive for ocular symptoms or ocular trauma. (*Id*.)

On June 8, 2011, Dr. Laurence Ligon, M.D., a medical consultant, completed a Physical RFC assessment for Plaintiff. (R. at 442-449.) He noted a primary diagnosis of fibromyalgia and a secondary diagnosis of "low back pain." (R. at 442.) He opined that Plaintiff had the physical RFC to lift and carry 10 pounds occasionally and 10 pounds frequently; stand and walk for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and pull an unlimited amount of weight with hand and foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; and never kneel or crawl; with no manipulative, visual, communicative, or environmental limitations. (R. at 443-448.) Dr. Ligon referenced the majority of Dr. Davis's notes regarding her

physical exam of Plaintiff.   (R. at 449.)  He noted that Plaintiff told her treating source that the medication regimen had made a big difference in her quality of life, she was able to perform activities of daily living, and she would not be able to function at the same level without the medication.[3] (*Id*.)  He found that Plaintiff appeared to be "responding to treatment" and "limitations [were] not as significant as alleged", and that there were discrepancies and inconsistences in the "[activities of daily living] form and report to treating source." (*Id*.)  Finally, he reported that Plaintiff's alleged limitations were partially supported by the medical evidence of record.  (*Id*.)

Plaintiff returned to SWPG on July 26, 2011, for a medication refill with complaints of constant pain in the lower back, neck, arms, and legs. (R. at 516.)  She rated her pain as a 9 out of 10, but she reported that the current analgesia regimen was effective for daily living activities and improved quality of life.  (*Id*.)  She denied any side effects.  (*Id*.)  A review showed that she was positive for depression, among other symptoms.  (*Id*.)

On September 19, 2011, Plaintiff reported having lower back and bilateral leg pain that she rated as an 8 out of 10.  (R. at 508.)  She reported that the Roxicodone was not helping her.  (*Id*.)  Mr. Buchl noted that narcotic therapy might not be the best therapy for her, as she had been "narcotic hopping" and stating that nothing helped.  (R. at 511.)  He reported that her goals may not be realistic, and that she got upset when he wanted to do follow-ups regarding medication changes. (*Id*.)  He noted that she had not followed up on any of the recommended physical therapy or sleep consults.  (*Id*.)

Plaintiff returned to SWPG on November 22, 2011, and complained of pain in the lower extremities and ongoing pain and numbness in bilateral hands.  (R. at 496.)  She wanted to discuss

---

[3]He appears to be referring to Plaintiff's December 30, 2010 visit with Dr. Bulger at SWPG.

14

additional options for pain control.  (*Id*.)  Plaintiff reported that she had side effects from Roxicodone, including trouble breathing and chest pain.  (*Id*.)  She also reported withdrawal side effects after stopping the Roxicodone.  (*Id*.)  She agreed to continue medication for pain control and to have Dr. Rodrique direct her treatment plan.  (R. at 497.)

On January 18, 2012, Dr. Rodrique noted that Plaintiff had "well-documented multilevel cervical degenerative disc disease from C4-5 through C6-7."  (R. at 519.)  He indicated that her disease was so severe that she would be a surgery candidate due to her neurologic symptoms in "bilateral upper extremities, which now manifest as bilateral paresthesias of the hands, particularly at night."  (*Id*.)  He further indicated that she had a "comcomitant" history of MS and fibromyalgia, but he believed her main pain issues were from the MS, and her main neurological issues were from her cervical degenerative disc disease.  (*Id*.)  He opined that she was disabled by "most anyone's criteria."  *(Id*.)

### 3.     Hearing Testimony

On January 30, 2012, Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 50-73.)  Plaintiff was represented by an attorney.  (R. at 50.)

#### a.     *Plaintiff's Testimony*

Plaintiff testified that she was 54 years old, 5 feet 7 inches tall, weighed 170 pounds, and was single.  (R. at 52-53.)  She drove one to three times a week.  (R. at 53.)

Plaintiff completed two years of junior college and two and one half years of court-reporting school.  (*Id*.)  She last worked full time in 2008 as an administrative assistant with "McAfee."  (*Id*.)  After that job, she started working contract positions.  (*Id*.)  She had done only executive assistant type work for the last ten years.  (*Id*.)

Her eyes periodically ached, and she had huge brown spots, mostly in her right eye, when she woke up. (R. at 54.) She took medication for her blood pressure that she thought kept it under control, but she'd had to go up in dosage recently. (*Id.*)

She had problems with her right hand and arm, which went dead sometimes. (*Id.*) Sometimes she just had no strength in her hand, and she could not "open bottles or anything." (*Id.*) She never had carpal tunnel surgery, and her doctors had not talked to her about that. (*Id.*) Her neurologist told her that her nerve damage was down the right side of her body. (*Id.*) She also had problems with her right leg and her right foot. (*Id.*) Her doctor told her that she had too many bulging disks in her cervical spine to operate on, and the disks "really [did] spur a lot of pain in [her] spine." (R. at 55.)

In response to the ALJ's question, Plaintiff reported that she saw Dr. Davis in February of 2011, and it "was a joke." (*Id.*) Plaintiff was very sick that day, and she came in right out of bed wearing sweats. (*Id.*) Dr. Davis "came in and met [her] and acted like she didn't know what to do with [her]". (*Id.*) She came back 30 minutes later, put a tape measure around Plaintiff's right calf, and that was the end of the visit. (*Id.*) Dr. Davis didn't touch any tender points, take her blood pressure, or do anything else. (*Id.*)

Plaintiff reported that she fell regularly and lost her balance. (R. at 56.) She fell in her bathtub "a while back" and bruised her right breast and ribs. (*Id.*) She didn't go to the doctor for her bruises because she knew there was nothing they could do. (*Id.*) After her fall, she did not take baths anymore, and taking a shower was a huge ordeal for her because she had trouble turning around and got dizzy. (*Id.*) As a result, she only bathed about once every three to four days. (*Id.*)

She did not visit with anyone about depression or anxiety, but Dr. Burbano prescribed her

16

Zoloft.  (*Id*.)  She was not sure if it helped or not, but she was unhappy.  (R. at 57.)  She had not told

Dr. Burbano that she was unhappy because "there's only so much they can do", and she could not

go to the doctor very often because she did not have any money.  (*Id*.)

Upon examination by counsel, Plaintiff testified that Dr. Rodrique was her pain management

doctor, and she had been seeing him since the end of 2010.  (*Id*.)  Although she "originally" talked

with Dr. Rodrique about physical therapy, back injections, and "things," she could not afford them.

(*Id*.)  Therefore, the only treatment he provided was pain medicine.  (*Id*.)

At the time of the hearing, she was on Oxycodone, Zoloft, Trazodone, and Mobic.  (R. at 57-

58.)  She had gone through several different pain medications because "they just stopped working

and he had to go to something higher."  (R. at 58.)  The Oxycodone eased her pain somewhat -

"between a zero and a ten it might go to seven at best," but she was so "wracked with pain," she did

not know if it was helping her.  (*Id*.)

Her right hand would go "totally numb and dead", and it was very painful when it happened.

(*Id*.)  She was unable to use it when it went dead.  (R. at 59.)  She is right-handed and had started

to use her left hand.  (*Id*.)  She could hold pens and pencils with her right hand when it went dead,

if she had not been grasping anything hard that week.  (*Id*.)  She'd had spasms at times where she

was "just jerking," and because of that, she had "thrown pans."  (*Id*.)  She had been trying to "learn

with [her] left hand" in part because the use of her right hand was "just going."  (*Id*.)

In her previous administrative assistant job, she did a lot of typing.  (*Id*.)  She could "not

really" type at the time of the hearing.  (*Id*.)  On some days, she could type for short periods of time,

and on some days she could not.  (*Id*.)  There were days when she felt better than other days.  (*Id*.)

She was not a "constant ten all the time," but she could not type for "two hours or one hour, and

[she] certainly [couldn't] do it all week or day after day." (R. at 59-60.)

Dr. Rodrique and Dr. Seals diagnosed her with severe fibromyalgia. (R. at 60.) She had arthritis in her spine and neck. (*Id*.) She believed she had multiple sclerosis and stated that due to her symptoms, a lot of her doctors seemed to believe it. (*Id*.) She could not get out of bed most days, and when she could, she was limited in how she could move about. (*Id*.) She had to get up in the morning and "first thing" take her medicine. (R. at 60-61.) She then had to feed her cats. (*Id*.) If she could not clean up after them at that time, she had to go to bed and do it later. (*Id*.) She was in her bed 80 percent of the day. (*Id*.)

Due to her pain, Plaintiff estimated that she could stand on her feet for only ten minutes on a bad day, and that the farthest she would be able to walk before she needed to get off her feet was about 30 yards. (*Id*.) She had to use a walker to get to the grocery store, and to use a basket once she was in the store. (R. at 61-62.) She was able to lift and carry most of her groceries, but she used a dolly for groceries that were too heavy for her to carry into her house. (R. at 62.)

In response to counsel's question, she guessed that ten pounds was the most she could lift and carry. (*Id*.) She thought the heaviest thing that she would have to carry was a case of water, and she could lift it for "a second." (*Id*.) She could not sit very long. (*Id*.) In a straight-back chair, she could sit for "maybe 30 minutes," and after that, she needed to lay down. (*Id*.)

She forgot things, including simple words. (R. at 63.) When she went for interviews, she could not think of things, and "people ended up finishing [her] sentences for her." (*Id*.) She had a lot of "deju vu kind of stuff where [she] would just kind of go away for a second and [she was] just losing time ... and losing thoughts." (*Id*.) She had strange thoughts sometimes - things that "[didn't] relate at all." (*Id*.) They would break her concentration and render her unable to remember

18

what she had read.  (*Id.*)

She attempted to go back to work two times after her onset date of August 27, 2010.  (R. at 64.)  At one job, she did the same type of work that she had done in the past.  (*Id.*)  It was "too far to walk, too long to sit, too painful." (*Id.*)  She attempted to perform another job at "Landsoft" after the onset of her disability, and she worked for "Landsoft" for two and one half weeks.  (R. at 65.)  She missed one day of those two and one half weeks because she could not get out of bed due to her pain.  (*Id.*)

In 2009, she had a very bad car wreck, and after that, everything that was already wrong "just got ten times worse."  (R. at 66.)  As a result, she could not "do stairs" or walk far.  (*Id.*)

### B.      ME's Testimony

The ME testified that "it sounds like there's a severe mental impairment."  (R. at 67.)  He also testified that Plaintiff's follow-up with Dr. Burbano indicated that there was a serious problem with narcotics.  (*Id.*)  He noted that she was taking extremely high doses of narcotics, "which she apparently [could not] quit taking," and he opined that she may have "narcotic hyperalgesia syndrome." (*Id.*)  He noted that she was diagnosed with fibromyalgia manifested by multiple tender spots, and that she had some paresthesia of both hands that was not associated with any motor deficiency.  (*Id.*)  He also noted that Dr. Davis's examination questioned whether "they" actually occurred, and her findings were limited to "some crepitus of the knees and some decreased range of motion of the neck and back."  (R. at 67-68.)  Plaintiff was "extremely tearful and anxious with pressured speech that day, as if anxiety and depression were really the major issues."  (R. at 68.)  The ME noted that she had scans from September 2009 showing multi-level disk bulges in both the neck and lumbar spine, and he testified that those were probably of no clinical significance, although

19

there was some "foraminal narrowing." (*Id.*)  There were no signs of motor and reflex deficits.  (*Id.*)

The ME testified that the 2007 MRI of Plaintiff's brain showed multiple non-specific areas of density in the white matter, which was not uncommon.  (*Id.*)  He noted that the doctor reading the MRI believed that multiple sclerosis was the "last likely possibility." (*Id.*)  He referenced the EMG nerve conduction study done in October 2010 that documented sensory changes across the carpal tunnel.  (*Id.*)  He opined that the sensory changes were probably "the algia, the paresthesia" that she experienced.  (*Id.*)

When asked by the ALJ whether Plaintiff's impairments, individually or in combination, met or medically equaled the requirements of a listing, he responded that he did not think there was any listing involved.  (R. at 69.)  He noted, however, that "there isn't a listing for fibromyalgia." (*Id.*)  He testified that "certainly" her neck and back issue did not meet or equal a listing because of the lack of motor reflexes.  (*Id.*)  Also, there was no significant visual impairment, and there was "certainly" not a diagnosis of multiple sclerosis.  (*Id.*)  There were no documented exertional limitations on a physical basis.  (*Id.*)  He stated that "we mainly have this problem with the excessive narcotic use and the hyperalgesia." (*Id.*)

When asked if the impairments were reasonably capable of producing functional limitations, the ME responded that "it's really up to her." (*Id.*)  He did not think there were any objective limitations, and he noted, "[s]he testified, as we've heard, that she limits her activities depending on how she feels." (*Id.*)

### C.  *VE's Testimony*

The VE classified Plaintiff's past relevant work as an executive secretary (SVP: 8) and an administrative assistant (SVP:7).  (R. at 70.)

20

The ALJ asked the VE to opine whether a hypothetical person at a sedentary level could perform Plaintiff's past relevant work if she had the RFC to lift 10 pounds occasionally and less than 10 pounds frequently; walk two hours and sit six hours out of an eight-hour day; stand and stretch every 30 to 45 minutes; avoid crawling; never climb ropes, ladders, or scaffolds; occasionally kneel, balance, stoop, and crouch; avoid vibration, hazards, machinery, and wet, humid environment; never reach overhead bilaterally; and frequently handle and finger on the right. (*Id.*)  The VE testified that the hypothetical person could perform Plaintiff's past relevant work.  (*Id.*)  He explained that with both of the jobs, the fingering was frequent, and standing or sitting was traditionally as needed.  (R. at 70-71.)  Additionally, there is typically no overhead reaching with those jobs.  (R. at 71.)

In response to the ALJ's question, the VE testified that Plaintiff would not be competitive at her past relevant jobs or even competitive in the national economy if she could not stand or walk for two hours out of an eight-hour day, and if she could not sit for six hours out of an eight-hour day. (*Id.*)

After counsel modified the hypothetical to limit "handle and finger" to only occasionally instead of frequently, and to "limit the individual down to unskilled, simple repetitive tasks," the VE testified that the hypothetical person would not be able to perform the past relevant work.  (*Id.*)

## C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on February 23, 2012.  (R. at 25, 44.)  At step one,[4] he found that Plaintiff had not worked at a level consistent with substantial gainful activity at any time since her alleged onset date of August 27, 2010.  (R. at 30.)  At step two, he found that Plaintiff has four severe impairments: lumbar disc disease, right carpal tunnel, fibromyalgia, and

---

[4]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

hypertension.  (R. at 31.)  Despite those impairments, at step three, he found that Plaintiff had no

impairment or combination of impairments that met or equaled the severity of any impairment listed

in the social security regulations.  (R. at 37.)  Next, the ALJ determined that Plaintiff had the

following RFC: lift, carry, push and pull 10 pounds occasionally and less than 10 pounds frequently;

stand and walk two hours out of an eight-hour work day; sit six hours out of an eight-hour work day;

occasionally balance, stoop, bend, squat, kneel and crouch; never crawl, climb, or use ropes, ladders,

or scaffolds; sit and stand at 30 to 45 minute intervals; avoid overhead reaching; frequent fine and

gross motor manipulation with right upper extremity; and avoid cold, heat, vibration, and hazards

such as dangerous machinery and heights.  (R. at 39.)  At step four, based on the VE's testimony,

the ALJ found that Plaintiff could perform her past relevant work.  (R. at 43-44.)  Accordingly, the

ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act,

from her onset date through the date of his decision.  (R. at 44.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient

for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla,

but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*. at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents two issues for review:

(1)     Pain alone can be disabling, even when its existence is unsupported by objective medical evidence if linked to a medically determinable impairment.  Fibromyalgia is recognized as an elusive condition that does not lend itself to objective testing. But the ALJ found objective testing failed to demonstrate fibromyalgia was reasonably capable of producing her symptoms.  Did the ALJ legally err in making his findings?

(2)     The regulations set forth a specific procedure to evaluate mental impairments that must be used to determine if an individual has a severe impairment at Step 2 of the disability process.  The Administrative Law Judge found Bewley's depression was not a severe impairment[] at Step 2, but did not rate the severity of her depression under 20 C.F.R. § 404.1520a.  Was the ALJ's decision legally deficient?

**C.     <u>Credibility</u>**

Plaintiff contends that the ALJ failed to make adequate credibility findings regarding her complaints of pain as required by SSR 96-7p.  (doc. 18 at17-18.)  She claims that he applied an improper legal standard that accepted only objective medical evidence as proof of a medically determinable impairment, and that required her to prove that her impairment could produce the level of pain of which she complained.  (*Id.* at 18, 20.)  She also contends that ALJ did not explicitly consider the seven factors listed in SSR 96–7p.  (*Id.* at 24-25.)

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). In evaluating a claimant's subjective complaints, the ALJ must

25

follow a two-step process.  SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco,* 27 F.3d at 164 (citing *Scharlow v. Schweiker,* 655 F.2d 645, 648–49 (5th Cir.1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect.  SSR 96–7p, 1996 WL 374186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  *Id.* at *3.  Even though the Fifth Circuit does not require an ALJ to "follow formalistic rules" in assessing a claimant's subjective complaints, "the ALJ must articulate reasons for rejecting" any such complaints.  *Falco*, 27 F.3d at 163-64.  The ALJ's "determination or decision must contain specific reasons for the

26

finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Plaintiff contends that pain can be considered disabling, despite the absence of supporting medical evidence for the pain itself, if linked to a medically determinable impairment. (doc. 18 at 12.) Not all pain is disabling, and subjective evidence need not be credited over conflicting medical evidence. *Jones v. Heckler*, 702 F.2d 616, 621 n. 4 (5th Cir.1983). At a minimum, objective medical evidence must demonstrate the existence of a condition that could reasonably be expected to produce the level of pain or other symptoms alleged. *Owens v. Heckler*, 770 F.2d 1276, 1281 (5th Cir.1985). In fact, 42 U.S.C. § 423(d)(5)(A) states "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain . . . alleged[.]" *Id.*; *see also Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990).

### 1.    Two-step Process

Plaintiff argues that "[b]ecause the ALJ found [Plaintiff's] impairments could not reasonably produce the degree of pain, he stopped his analysis at step one." (doc. 24 at 14.)

Here, the ALJ's written decision expressly states that he considered Plaintiff's symptoms in accordance with 20 C.F.R. § 404.1529. (R. at 39.) It also expressly identified the two-step process the ALJ was required to follow. (*Id.*) The decision then discusses Plaintiff's symptoms. (R. at 40). The ALJ acknowledged the link between her alleged symptoms and her medically determinable impairments:

> In this case, the claimant appears to be sincere and genuine regarding the pain and limitations she states she experiences with the medical

27

> impairments.  If accepted as described, the claimant would be prevented
> from completing even sedentary exertional functions.  However, the
> claimant's most serious symptoms and limitations are simply outside the
> range of reasonable attribution according to the medical opinions of record.
> *Luna v. Bowen*, 834 F.2d 161, 164 n.3 (10th Cir. 1987) and *Loya v.*
> *Heckler*, 707 F.2d 211, 214 (5th Cir. 1983).  As indicated hereinafter, the
> medically determinable impairments cannot reasonably be expected to
> produce the symptoms to the degree alleged by the claimant.

(R. at 41-43.) He proceeded to discuss, albeit very briefly, the laboratory findings and  medical opinions upon which he relied to reach his determination.  (R. at 42-43.)

The ALJ noted that an EMG study conducted on Plaintiff revealed evidence of moderately severe "sensory neuropathy" across the right wrist.  (R. at 42.)  He also noted that an MRI of her lumbar spine showed minimal broad based disc bulges which resulted in no significant canal or neural foraminal narrowing, and an MRI of her cervical spine showed, "cervical spondylosis resulting in multilevel borderline to mild thecal sac narrowing and mild to severe bilateral neural foraminal narrowing with no cord compression or cord edema."  (*Id.*)

The ALJ also considered that Plaintiff tried numerous pain medications and complained of multiple side-effects from those medications.  (*Id.*) She reportedly requested that one of her pain medications be refilled two weeks early because someone had stolen it.  (*Id.*)  The ALJ noted that although she was advised to go to the emergency room on at least two occasions, she refused to do so.  (*Id.*)  At one point, despite her reports of pain, she refused to see any doctor other than Dr. Rodrigue.  (*Id.*)

The ALJ took into account the ME's testimony that he found no objective findings in the record that would justify the degree and long-term nature of Plaintiff's pain and inability to function. (*Id.*)  He also considered the MC's conclusion that Plaintiff could not do more than sedentary work activity.  (*Id.*)

28

The ALJ considered the conclusion of Dr. Rodrique, one of Plaintiff's treating physicians, that Plaintiff was disabled.  (*Id*.)  He noted that the conclusion was conclusory and a legal opinion reserved for the Commissioner, and that an ALJ may discount the weight of a treating physician's opinion in favor of other experts when the evidence is conclusory and unsupported by medically acceptable evidence.  (R. at 42-43.)  Considering the inconsistent objective "normal" physical and mental status exams found in the record, the EMG and MRI results, and the observations and diagnoses of Dr. Rodrigue, the ALJ found that Dr. Rodrigue's "disabled" conclusion was not supported by the record, including Dr. Rodrique's own record.  (R. at 43.)  He therefore, did not give it significant weight.  (*Id*.)

He also considered the RFC opinion of Dr. Cremona, a non-examining source, which addressed Plaintiff's impairments and their impact on function.  (*Id*.)  The ALJ acknowledged that Dr. Cremona did not treat or examine Plaintiff, but he noted that the doctor reviewed the entire medical record.  (*Id*.)  He also noted that Dr. Cremona's findings were consistent with Dr. Davis's consultative exam findings and Dr. Hargrave's findings.  (*Id*.)  He found that his opinions were supported by the medical record, and he assigned significant weight to his opinion regarding Plaintiff's impairments and the limitations they would reasonably produce.  (*Id*.)

The ALJ ultimately determined that Plaintiff's allegations of her symptoms were not credible to the extent they were inconsistent with the medical opinions and other evidence.  (R. at 43.)  His conclusion specifically stated that he had considered these medical opinions as well as Plaintiff's statements about the intensity, persistence, or functionally limiting effects of her symptoms on her ability to do basic work activities:

> After careful consideration of the medical opinions of record, I find that the claimant's medically determinable impairments cannot reasonably be expected to

> produce the symptoms to the degree alleged by the claimant.  The claimant's statements concerning the intensity, persistence and limiting effects of these symptoms have been determined to diminish the capacity for basic work activities only to the extent to which they can reasonably be accepted as consistent with the objective medical and other evidence.  20 CFR § 1529(c)(4).

(R. at 43.)  Although a clearer demarcation of the discussion of each step and greater detail would have been helpful, the ALJ's decision shows that he did proceed to the second step of the credibility analysis.[5]

### 2.     Seven-factor Test

Plaintiff also argues that the ALJ did not apply the seven factors listed in SSR 96-7p. (doc. 19 at 24-25.)

The ALJ addressed several of the non-exclusive credibility factors listed in SSR 96-7p in assessing Plaintiff's credibility.  (R. at 40.)  He addressed her description of her daily activities, which covers the first factor.  (*Id.*)  The ALJ also discussed the second factor, i.e., the location, duration, frequency, and intensity of Plaintiff's symptoms, such as her pain and numbness.  (*Id.*)  He noted that she had too much pain from sitting and walking, which goes to the third factor.  (*Id.*)  He also noted that Plaintiff tried various medications, including narcotics, none of which was "helpful for long," and that she was on medication for high blood pressure as well as medication to treat depression and anxiety.  (R. at 40, 42.)  Similarly, he noted that she complained of side-effects from almost all the medications except for the narcotics, which is the fourth factor.  (R. at 42.)  The ALJ considered that Plaintiff had seen a pain management specialist doctor for about two years,

---

[5]Plaintiff also contends that (i) the ALJ's finding that fibromyalgia could not reasonably be expected to produce Plaintiff's symptoms was contravened by his finding at Step 2 of the disability analysis, and (ii) the ALJ was looking for the wrong objective when determining whether fibromyalgia was a medically determinable impairment. (doc. 18 at 20-24.)  Because the ALJ did reach step two of the credibility analysis, he necessarily found that Plaintiff's fibromyalgia was a medically determinable impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, just not to the degree she alleged.

which is part of the fifth factor. (R. at 40.) He also addressed other factors, such as the amount of time she spent in bed, the fact that she fell regularly, the large blind spot in her right eye, her difficulty holding things and writing, and the fact that her right hand went "dead" at times. (*Id*.)

As noted, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints of pain. *Falco*, 27 F.3d at 164. Although not in a formalistic fashion, the ALJ considered the factors for assessing credibility and relied on substantial evidence, including objective medical findings and Plaintiff's own statements, to support his credibility determination. Because a review of the ALJ's credibility assessment reveals that he addressed the applicable factors outlined in SSR 96-7p, remand is not required on this issue.

**D.      Mental Impairment**

Plaintiff contends that the ALJ found at step two that her depression was not a severe impairment, but he failed to rate the severity of her depression under 20 C.F.R. § 404.1520a. She alleges (i) that the ALJ recognized that she had mental impairments, but he did not rate the degree of functional loss she exhibited in each of the four broad function areas named in 404.1529a(c)(3), and (ii) she presented evidence of a non-frivolous claim of mental impairment. (doc. 14 at 27, 29.)

In making his disability determination, an ALJ is required to determine whether a claimant has "impairments" which, singly or in combination, are severe. 42 U.S.C. § 1382c. "For Social Security disability purposes, an 'impairment' is an abnormality that can be shown by medically acceptable clinical and laboratory diagnostic techniques, and in fact must be established by medical evidence as opposed to the claimant's subjective statement or symptoms. *Prince v. Barnhart*, 418 F. Supp. 2d 863, 867 (E.D. Tex. 2005) (citing 20 C.F.R. § 416.908). When determining whether a

claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). If the ALJ does find a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523.

In evaluating the severity of mental impairments, the ALJ must follow a special technique at each level of the administrative process. 20 C.F.R. § 404.1520a(a). If an ALJ concludes that a claimant has a medically determinable mental impairment, he must then rate the degree of functional limitation resulting from the impairment. *Id*. The degree of functional limitation is rated in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the impairment will be found not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Failure to evaluate all alleged mental impairments in accordance with the procedures described in 20 C.F.R. § 404.1520a is reversible error. *Satterwhite v. Barnhart*, 44 Fed. App'x. 652, *1-2 (5th Cir. June 6, 2002). *See also Selassie v. Barnhart*, 203 Fed. App'x 174, 176 (9th Cir. Oct 20, 2006); *Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005).

In this case, although Plaintiff's initial application for benefits did not allege depression, she mentioned her alleged depression at the hearing. She reported that she was unhappy and was prescribed Zoloft, a medication used to treat depression. (R. at 57.) The ME testified that "[i]t

sounds like there's a severe mental impairment," and he opined that anxiety and depression might be the "major issues." (R. at 67.) The record also contained evidence of Plaintiff's alleged depression. Dr. Burbano noted an impression of mild depression. (R. at 389.) Dr. Hu noted that depression was part of Plaintiff's past medical history, and she complained of depression to him. (R. at 353-54.) Plaintiff also reported to Dr. Davis that she suffered from depression, which worsened as her pain worsened, and Dr. Davis noted an impression of depression. (R. at 399-427.) Mr. Buchl at SWPG also noted depression upon a review of her symptoms. (R. at 427.)

The ALJ did not make any finding regarding depression at step two. (*See* R. at 31-37.) At step three, he noted that individuals who have fibromyalgia may experience medical signs such as depression or anxiety, and that when such signs are present, the existence of a medically determinable impairment is established. (R. at 38.) He found that Plaintiff had never been treated for depression and that she denied she was depressed. (*Id.*) He ultimately concluded that she did not have an impairment or combination of impairments that met or medically equaled the requirements of a listing. (R. at 37-38.) Accordingly, it does not appear that the ALJ considered Plaintiff's depression as a medical impairment, severe or not, but that he only considered it a symptom of her fibromyalgia. He failed to consider the effect of her depression in combination with her other impairments, and he failed to consider the severity of her depression in accordance with 20 C.F.R. § 404.1520a(a).

Because Plaintiff's subjective complaints of depression were corroborated by objective medical evidence in the record, the ALJ was required to consider the effect of Plaintiff's depression in combination with her other impairments. He was required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, was

sufficiently severe.  *Loza*, 219 F.3d at 393.  Moreover, he was required to consider the combined impact of the impairments throughout the disability determination process.  20 C.F.R. § 404.1523. In failing to consider the effect of Plaintiff's depression in compliance with 20 C.F.R. § 404.1523, the ALJ committed error.  He also committed error in failing to evaluate all alleged mental impairments in accordance with the procedures described in 20 C.F.R. § 404.1520a.

Violation of a regulation constitutes reversible error and requires remand only "when a reviewing court concludes that the error is not harmless."  *Pearson v. Barnhart*, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F.Supp.2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank*, 326 F.3d at 622).  Here, it is conceivable that consideration of the effect of Plaintiff's depression in combination with her other impairments could result in a different disability determination.  The error is therefore not harmless, and remand is required on this issue.

### III.  CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED on this 30th day of September, 2014.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE